**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LEXINGTON MEDICAL, INC.,**<br>**Plaintiff,**<br><br>v.<br><br>**MEDTRONIC, INC.,**<br>**Defendant.** | Civil Action No. 26-cv-14981<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Lexington Medical, Inc. ("Lexington"), for its Complaint against Defendant Medtronic, Inc. ("Medtronic"), alleges as follows:

## NATURE OF THE ACTION

1. This case is about a monopolist that wins through exclusionary conduct what it cannot win on the merits. Medtronic is the world's largest medical device company and controls and sells the dominant laparoscopic universal handle stapler under the Signia and Endo GIA brands (the "Medtronic Staplers"). Medtronic maintains its more than 90% share of the market through exclusionary conduct.

2. Lexington is an innovative medical device company that is solely focused on developing and selling high-quality laparoscopic universal handle staplers. Clinical studies have proven the superiority of Lexington's AEON™ Endoscopic Stapling System (the "AEON Staplers") compared to the Medtronic Staplers. In multiple peer-reviewed studies spanning more than 2,200 patients, the AEON Staplers have matched or outperformed Medtronic, including a statistically significant reduction in intraoperative bleeding and postoperative complications. The AEON Staplers also outperform Medtronic in the field. For example, after one head-to-head hospital trial, surgeons rated Lexington "clinically superior" in 89% of cases. The Lexington

platform also offers the broadest reload menu on the market. Absent Medtronic's conduct, Lexington's AEON Staplers would win on the merits but Medtronic prevents that from happening through anticompetitive conduct.

3. First, Medtronic engages in exclusionary conduct to stop hospitals from conducting evaluations of rival products through product trials. Second, even where a rival is able to conduct a successful trial and offer a better product at a lower price, Medtronic uses exclusionary bundling to make it impossible for rivals to close the deal. Third, Medtronic's market-share-maintenance requirements, enforced through compliance forms, audits, rebates, and the threat of penalty pricing across every product category, turn each exclusion into a multi-year exclusion. Medtronic's long-term agreements thus lock up customers and substantially foreclose competition. The result: hospitals stay locked into Medtronic's portfolio for years, at the cost of higher prices, fewer choices, and less innovation.

4. The playbook is written down in Medtronic's now-public documents.[1] Step one: Medtronic makes sure rivals almost never get a product trial. Medtronic's written instructions to its sales force are explicit: "If accounts begin competitive trials, communicate violation" and "be prepared to take them to access/list tier." Such "access/list" pricing refers to greatly increased penalty pricing across a wide range of products. Another document describes seeking to "eliminate the competition from getting a window that would allow for a trial."

---

[1] The allegations in this Complaint rest on publicly available information and on information known to Lexington. Unless otherwise indicated, this Complaint's descriptions of, and quotations from, Medtronic documents and testimony are based on public information from the public docket in *Applied Medical Resources Corp. v. Medtronic, Inc.*, Case No. 8:23-cv-00268-WLH-DFM, Dkt. Nos. 331, 336, 377, 379, 381, 383, 385, 387, 389, 391, 393-3, 393-4, 413 (C.D. Cal.), namely the closing slides, JMOL briefing, and/or the trial transcripts. All emphasis in quotations is added unless otherwise noted.

5. Step two: when a trial does happen and is successful, Medtronic uses exclusionary bundling to make the deal impossible to close. Medtronic's agreements condition the pricing, rebates, and so-called "discounts" for its broad portfolio of other products on the hospital's continued purchase of Medtronic Staplers. A hospital that moves its stapler business to a rival therefore forfeits so-called "discounts" and rebates across products the rival does not sell. The rival must offset that portfolio-wide penalty to win the sale, which is impossible for smaller rivals that do not sell the entire bundle of products. After the discounts, rebates, and pricing that a hospital forfeits by moving its stapler purchases to a rival are attributed to staplers, the effective price of Medtronic Staplers is below Medtronic's average variable cost. Accordingly, no rival that does not offer Medtronic's bundle can compete. Indeed, Medtronic's now-public documents boast that leveraging its portfolio in this way makes it "impossible" for a rival to close a deal. Those documents also confirm Medtronic designed the bundle to defend its business. Medtronic's "Protect the House" playbook, aimed at "[d]efending" Medtronic's business, directs Medtronic's sales force to "[b]undle COTs (Energy, Endo, Hernia, etc)."

6. Step three: Medtronic locks the door and brags about it. Medtronic signs long-term restrictive contracts that lock customers in for years. Medtronic's chief executive boasts to investors that Medtronic has "very tight contracts that have been tested over time," such that even when Medtronic suffers "a supply shortage" and "a competitor takes up that" business, Medtronic ends up "right back to where we were based on the contract." A Medtronic Regional Vice-President likewise boasts of customers being "locked down for years to come."

7. Medtronic thus leverages its enormous portfolio and dominant positions to coerce hospitals into continuing to purchase Medtronic products. The bundle spans staplers and other products over which Medtronic holds monopoly power or at least significant market power,

including monopolar products (approximately 60% share) and advanced bipolar devices (over 70% share).

8. The consequences are straightforward and anticompetitive. Hospitals often cannot even try a rival's products. Even a rival that wins a trial and offers substantially lower prices cannot displace Medtronic because the bundle forces it to offset penalties across products it does not sell. An equally efficient rival cannot match those penalties because it does not sell the portfolio of products that Medtronic uses as leverage.

9. Although Medtronic frames its penalties as "discounts," they are not true discounts. Medtronic regularly raises its non-bundled prices so that it can label the widening differential an ever-larger "discount." The differential is thus no discount; it is a penalty for buying from a rival. Medtronic also uses its bundle to hide price increases. As one now-public document shows, Medtronic "pass[ed] along a meaty price increase," and its regional vice president of sales explained "the inclusive wrap" "becomes an attractive way to defend our business and/or hide a price increase" because products folded into wrap agreements would "just be included in the wrap and hope not to be noticed." Because Medtronic buries its price increases in the bundle, hospitals cannot see the true price of any product, the true size of any "discount," or the true magnitude of the penalty for choosing a rival.

10. When Medtronic excludes a rival like Lexington, the result is not a single lost transaction. Hospitals enter and renew long-term agreements with significant market-share commitments, volume requirements, and rebate conditions across numerous product categories, which excludes rivals for years. Medtronic polices those commitments through compliance forms and audits. A hospital that falls short in any ***one*** category faces termination of the agreement and loss of its so-called discounts in ***every*** category.

11. The 10% to 20% windows in Medtronic agreements are illusory: a hospital that slips below its commitment risks penalties across numerous categories. The risk peaks where a rival's product is best because doctors using a superior product buy more and tell other doctors at the same hospital to use the superior product, which creates a greater risk of pushing the hospital out of compliance. Missing a market-share commitment by even a single dollar results in punitive pricing across Medtronic's entire portfolio. Indeed, Medtronic's now-public documents show that it instructs employees to raise prices if a customer "slip[s] $1 below the 85% commitment." Because even a small purchase of competing products can trigger portfolio-wide penalties, hospitals are unwilling to risk such purchases.

12. Medtronic knows exactly what open competition produces. When "carve out" protections let a previously excluded rival compete for trocars,[2] the competitor eventually became the market leader and customers saved hundreds of millions of dollars annually. Medtronic's now-public documents concede that the "'carve-out' language that protect[ed] non-full line suppliers" "fueled" that rival's "growth" and forced Medtronic and others to reduce prices. Medtronic thus vowed not to let that happen again with other products.

13. Medtronic's intent to monopolize is also revealed in its own now-public documents. Medtronic instructs its sales force to "look to monopolize Energy, Endo, ES, Hernia, Legacy GSP, and yes EVEN Suture." Medtronic boasts internally of the "portfolio breadth we currently maintain a monopoly on" and celebrates its bundle as the "ultimate gorilla." And Medtronic's documents celebrate agreements that are as "'iron clad' as an agreement can get," that "lock[] down [customers] for years to come," and that "widen the moat around [Medtronic's] business."

---

[2] Trocars are instruments that puncture a body wall to create an access point for laparoscopic devices, like laparoscopic universal handle staplers, to pass through when conducting surgeries.

14. Lexington has achieved substantially stronger double-digit market shares in more open markets, such as Europe, where tender processes make bundling less prevalent. The tender process requires that vendors bid for a hospital's business on particular products without bundling them together with other products. The products are the same in both regions. The principal difference is that tender processes, which require vendors to bid product by product, limit the power of Medtronic's bundle. AEON's adoption abroad confirms that its limited U.S. penetration reflects Medtronic's conduct, not any deficiency in the device. Where purchasing is less dominated by bundled portfolio contracting, AEON has been much more successful as surgeons and hospitals have been free to choose AEON on its merits.

15. Accordingly, Lexington brings this action under Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the Massachusetts Antitrust Act, and related Massachusetts law to recover treble damages, obtain permanent injunctive relief, and restore competition.

## PARTIES

16. Lexington Medical, Inc. is a medical device company organized under Delaware law that maintains its principal place of business in Bedford, Massachusetts. Lexington designs, develops, and sells surgical stapling products, the AEON Staplers. Lexington sells its products in interstate commerce in an attempt to compete with Medtronic's stapling products. Lexington is a U.S.-based manufacturer: it designs and engineers the AEON Staplers in the United States; it performs the critical manufacturing operations, including automated staple loading, final assembly, packaging, and quality testing, at its own U.S. facility; and it builds much of its own production automation and machinery in-house in the U.S.

17. Lexington was founded and is led by an engineer-entrepreneur, devotes a substantial share of its resources to engineering, and has iterated rapidly since launching its first stapler in

2018. Within a few years, Lexington has developed more than ten product generations, which represents a development pace among the fastest in the medical device hardware industry. Lexington continues to expand its domestic engineering and manufacturing capacity and stands ready to compete and scale absent Medtronic's exclusionary conduct.

18. Medtronic, Inc. is incorporated in Minnesota and maintains its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Medtronic markets and sells surgical devices and related products across the United States, including in Massachusetts and in this District. Medtronic sells surgical stapling products, including the Endo GIA and Signia stapling platforms, as well as the other products that Medtronic uses in its exclusionary bundles.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19. Subject-matter jurisdiction over Lexington's federal antitrust claims exists under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337. Because Lexington's state-law claims form part of the same case or controversy as its federal claims, this Court may exercise supplemental jurisdiction over them under 28 U.S.C. § 1367.

20. Medtronic is subject to personal jurisdiction in this Court: it regularly transacts business in Massachusetts, sells medical devices to Massachusetts hospitals, contracts with hospitals and with group purchasing organizations ("GPOs") whose membership includes Massachusetts hospitals, and has engaged in conduct causing anticompetitive effects both in Massachusetts and nationwide. Those effects reach hospitals in this District. For example, Medtronic has blocked rivals and product trials at hospitals in this District. After a thoracic surgeon at a Boston academic medical center discussed trialing the AEON Staplers with Lexington and raised the possibility internally, the hospital decided that "due to their bundled agreement with Medtronic" it "would not be able to proceed based on commitments."

21. Venue lies in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c). Medtronic transacts business in this District, has caused injury in this District, and its anticompetitive conduct has affected Lexington, a Massachusetts-based rival, in this District.

22. The conduct alleged here occurs in, and has effects on, interstate commerce. Surgical staplers and the other products in Medtronic's bundles all move across state lines as they are manufactured, distributed, sold, and shipped. Medtronic's agreements with GPOs, hospitals, and hospital systems shape purchasing nationwide and have a direct effect on the price, output, availability, and sale of medical devices in interstate commerce.

## FACTUAL ALLEGATIONS

### A. Surgical Stapling

23. Surgical staplers place rows of staples in tissue and, depending on the device, cut between the staple lines. Staplers are essential in many procedures because they let surgeons divide, resect, and transect tissue efficiently while maintaining hemostasis and tissue integrity. Stapler performance can affect operative time, tissue handling, complications, and length of hospital stay.

24. Laparoscopic staplers are built primarily for minimally invasive procedures. Laparoscopic staplers must pass through trocars. They also must articulate within confined anatomical spaces, fire staple loads reliably, and give surgeons confidence in staple formation and tissue compression. Laparoscopic stapling products are not reasonably interchangeable with many other surgical devices because they perform a distinct surgical function.

25. Powered laparoscopic staplers use powered (motorized) firing mechanisms for consistent staple formation and transection. Non-powered laparoscopic staplers rely primarily on manual firing.

26. Laparoscopic universal handle staplers are laparoscopic staplers built around a single "universal" handle that accepts, actuates, and fires a full range of interchangeable, single-use reloads spanning different staple-line lengths, staple heights, and tip configurations, so that a surgeon can complete an entire procedure with one handle. As discussed below, hospitals and surgeons evaluate these staplers separately from other stapling configurations. Laparoscopic universal handle staplers constitute a distinct relevant market that Medtronic dominates.

27. Laparoscopic universal handle staplers sell as a platform with single-procedure handles and single-use reloads. Surgeons train on, and develop preference for, a particular platform's handle, reloads, and firing characteristics, so converting an institution to a different platform requires retraining, product evaluations, and changes to inventory and instrument sets. These features create meaningful switching costs.

28. Among Medtronic's laparoscopic stapling products are the Endo GIA manual stapler and the Signia powered stapler. Lexington offers the AEON Staplers. The AEON Staplers are cleared by the FDA and are available in both manual and powered versions. Lexington positions the AEON line as a direct alternative to Medtronic's platform across the same surgical specialties. Surgeons report that the device uses a familiar design and fits into standard stapling practice. In published and bench head-to-head comparisons, the AEON Staplers have matched or beaten Medtronic's Endo GIA with Tri-Staple technology, including significantly lower staple-line bleeding in a randomized comparison. The AEON Staplers are thus a ready, regulatory-cleared, and clinically superior substitute that hospitals and surgeons could adopt in place of Medtronic's products but for Medtronic's exclusionary conduct.

29. The AEON platform also offers the broadest reload menu on the market: thirty-six unique reload configurations spanning the widest range of staple heights, from the thickest tissue

loads to fine vascular loads. Surgeons credit its proprietary features with clinical and ergonomic advantages, including exceptionally smooth firing and lockable articulation that holds its position, a powered handle that senses tissue and adjusts firing in real time, and specialized reloads such as a short-tip family for tight spaces, a curved-tip reload for thick bronchial transections, and a narrow six-row anvil for vascular work.

30. Independent, peer-reviewed clinical evidence confirms that the AEON Staplers perform as well as or better than Medtronic's stapling products: numerous studies spanning five surgical specialties and more than 2,200 patients, including multiple head-to-head comparisons against Medtronic's Signia and Endo GIA staplers and associated Tri-Staple reloads.

31. For example, a Mayo Clinic study of video-assisted thoracoscopic wedge resection compared the AEON Stapler directly against Medtronic's Signia stapler and found comparable outcomes across all postoperative endpoints. In a prospective, randomized, single-blinded trial of laparoscopic sleeve gastrectomy, the AEON Stapler produced a statistically significant reduction in intraoperative bleeding compared to Medtronic's Tri-Staple device, as graded by a blinded independent evaluator. In a 250-patient bariatric comparison, the AEON Stapler achieved hemostasis outcomes comparable to Medtronic's Tri-Staple device even though the AEON cases used no buttress (reinforcing) material while the Medtronic cases used preloaded buttress reinforcement. The largest published AEON dataset, comprising 1,848 bariatric patients, compared the AEON Stapler (814 patients) against Medtronic's Endo GIA Tri-Staple device (1,034 patients). Both devices proved safe and effective with low complication rates and performed comparably in sleeve gastrectomy and single-anastomosis duodenoileostomy with sleeve. In Roux-en-Y gastric bypass, AEON patients had statistically significantly fewer overall complications, fewer transfusions, and fewer reoperations for staple-line bleeding. The authors

reported no stapler-related complications during the final thirteen months of the AEON study period (428 operations, or approximately 53% of the AEON cohort). The only staple-line leak in the study occurred in the Medtronic Endo GIA cohort.

32. In hepatopancreatobiliary surgery, the AEON Stapler outperformed Medtronic's Endo GIA in distal pancreatectomy, reducing the postoperative pancreatic fistula rate from approximately 65% to 20%, eliminating clinically significant (Grade B and C) fistulas, lowering day-three drain lipase, and shortening hospital stay by roughly three days. A 2026 narrative review of the AEON clinical literature reported zero stapler-related complications across 428 cases and a substantially lower need for staple-line reinforcement than with Medtronic's devices.

33. Beyond the published literature, surgeons across thoracic, bariatric, hepatopancreatobiliary, and surgical-oncology practice who have adopted AEON report outcomes equal or superior to the Medtronic Staplers they previously used (including pre-adoption bench testing on tissue specimens in which AEON outperformed competing staplers), and describe AEON as a meaningful advance over long-established platforms.

34. Doctors and hospitals who have used AEON report numerous benefits, including a notable decrease in postoperative air leaks, quicker time to removing chest tubes and to discharging patients, a significant reduction in the percent of patients going home with a chest tube, significantly shorter hospital stays, and unique features that allow surgical techniques not possible with Medtronic devices. Lexington also performs very well when it is able to conduct trials. For example, surgeons after one trial ranked Lexington "clinically superior" in 89% of cases. As alleged below, however, clinical superiority has not overcome Medtronic's exclusionary conduct in the United States.

### B. The Role of GPOs in Hospital Purchasing

35. Much of hospital purchasing of surgical products runs through GPOs and GPO-negotiated agreements. GPOs are intended to pool the purchasing of large groups of hospitals and negotiate supplier contracts on their behalf, purportedly to secure better terms for those hospitals. GPOs, however, do not always act in their member hospitals' interests. GPOs collect "administrative fees" calculated as a percentage of all sales made under their contracts. The fee structure gives GPOs an incentive to favor whichever suppliers pay them the most, rather than the suppliers offering hospitals the best products at the lowest prices.

36. Recognizing that conflict, GPOs previously agreed to cap administrative fees at 3% of sales, but have since strayed from that limit. Medtronic pays GPOs above the 3% level in exchange for larger purchasing commitments and greater exclusivity, further aligning the GPOs' financial interests with Medtronic's exclusionary objectives instead of with their member hospitals' interests. Some GPOs go further by barring member hospitals from entering local agreements and requiring that purchasing run through the GPO's own agreements. Working with Medtronic, such GPOs police member hospitals' compliance with their purchasing commitments.

37. Medtronic signs GPO agreements that coerce GPO members into exclusionary GPO tiers and local Medtronic contracts featuring market-share purchase requirements and exclusionary bundling. Such agreements deter GPO members from buying products from Medtronic rivals that are not on the GPO contract. Medtronic also takes deliberate steps to keep rivals off GPO agreements in the first place.

38. Through its GPO and hospital contracting, Medtronic converts the breadth of its portfolio into exclusionary leverage. The bundle lets Medtronic make discounts, rebates, and preferred pricing across multiple product lines contingent on a hospital's continued purchase of

Medtronic Staplers. The leverage is potent because hospitals buy far more from Medtronic than Medtronic Staplers alone and depend on Medtronic products across multiple operating-room categories. Hospitals become bound by these long-term exclusionary agreements by one of two routes: selecting an enhanced pricing tier within a Medtronic GPO agreement, or contracting locally and directly with Medtronic.

39. Thus, Medtronic bundles in its GPO agreements and, where it cannot, bundles in local agreements to the same exclusionary end. In short, Medtronic bundles wherever it can, at every stage of contracting, leveraging its unmatched product portfolio and wielding pricing penalties to exclude would-be rivals such as Lexington.

## C. The Relevant Product Market

### 1. Laparoscopic Universal Handle Staplers Constitute the Relevant Market

40. The relevant product market consists of laparoscopic universal handle staplers sold in the United States. Unlike instruments used for open surgery, laparoscopic staplers are longer, narrower, and articulating so that they can reach and transect tissue in a restricted space through a trocar.[3] Surgeons select between the open and laparoscopic categories based on the specific surgical task. It is simply not possible to use open staplers in laparoscopic surgery because they do not fit through a trocar. Because a surgeon cannot substitute open staplers for laparoscopic staplers, the categories exhibit little or no cross-elasticity of demand. A price increase in one category would not cause surgeons or hospitals to switch to another.

41. Laparoscopic universal handle staplers are laparoscopic linear cutter staplers built on a single-procedure handle, commonly described as a "universal" handle, that accepts a series of

[3] Laparoscopic staplers are also called "endoscopic staplers" or "endostaplers."

interchangeable, single-use loading units, or "reloads." A given procedure uses one handle and often multiple reloads. A single universal handle accepts the full range of compatible reloads (spanning different lengths, staple heights, and tip configurations) so that a surgeon can complete an entire procedure, using different reloads matched to different tissues or tasks, with one handle. Medtronic's Endo GIA and Signia stapling systems and Lexington's AEON Staplers are laparoscopic universal handle staplers.

42. The principal participants in the market for laparoscopic universal handle staplers are Medtronic and Lexington. Medtronic sells the Endo GIA stapler (including the Endo GIA Universal and Endo GIA Ultra Universal handles) and the Signia Stapling System. In each case, the Medtronic device uses Tri-Staple or Tri-Staple 2.0 single-use reloads that load into the handle. Lexington sells the AEON Endoscopic Stapling System, which accepts the full range of AEON single-use reloads (including 30 mm, 45 mm, and 60 mm reloads in a range of staple heights and tip configurations) on a single handle.

43. Laparoscopic universal handle staplers are designed for, and are essential to, minimally invasive surgery. Their long, narrow shafts, which articulate and can be fired with one hand, are designed to pass through laparoscopic trocars and to reach, clamp, staple, and transect tissue within confined anatomical spaces from a limited number of access ports. These are capabilities that open staplers, circular End-to-End Anastomosis ("EEA") staplers, and skin staplers do not provide. Surgeons use laparoscopic universal handle staplers across general, bariatric, colorectal, thoracic, gynecologic, hepatobiliary, and other procedures to resect and transect tissue and create anastomoses.

44. A defining and clinically important feature of laparoscopic universal handle staplers is that each reload is a sterile, single-use cartridge that carries its own fresh cutting blade, or knife.

Each time the surgeon fires the device, a new, sharp, sterile blade transects the tissue between the freshly deployed staple rows, and that blade is then discarded together with the spent reload. The deployment of a fresh blade with every firing is important to surgical safety, including in oncologic surgery. Published surgical research shows that viable tumor cells can exfoliate during cancer operations and collect on stapling devices and cartridges: malignant cells have been found on circular staplers, and exfoliated colon cancer cells have been detected on the cartridges of linear staplers used for anastomosis in a meaningful percentage of cases. The implantation of such viable exfoliated tumor cells is a recognized mechanism of local and anastomotic cancer recurrence. Because each firing of a laparoscopic universal handle stapler deploys a fresh blade and cartridge that are then discarded, the device never carries a single blade across multiple cuts, which helps avoid transferring viable tumor cells along the surgical field and reduces the risk of seeding cancer cells.

45. A sharp, unused blade also makes a clean, complete transection with less force, reducing drag, crushing, and tearing of the tissue along the cut line and the bleeding and tissue trauma that follow. A blade that has dulled over repeated firings can drag through tissue, cut incompletely, and leave ragged edges that compromise the staple line. Discarding the blade with each reload also means that a blade exposed to one tissue or site, such as bowel contents or an otherwise contaminated field, is never carried into another, reducing the risk of cross-contamination and infection within the surgical field. And because the anvil and staples are replaced together with the blade, every firing starts from new, uniform components, which supports consistent staple formation and hemostasis from the first firing of a procedure to the last.[4]

---

[4] The "anvil" of a stapler is typically a metal plate on the opposite side of the tissue, which includes grooves that bend the staple back towards the tissue to complete the seal.

Many surgeons, particularly oncologists, accordingly require stapling systems that deploy a fresh blade and a fresh cartridge with each firing.

46. Laparoscopic universal handle staplers also depend on a wide variety of reloads (each with its own blade, staple-line length, and staple height) that are tailored to specific tissues and surgical applications. Manufacturers offer reloads in multiple lengths (for example, 30 mm, 45 mm, and 60 mm) and in a range of staple heights matched to tissue thickness and vascularity, conventionally identified by color. The reloads also come in specialized tip and curvature configurations. By way of illustration, Lexington's AEON platform offers reloads spanning tissue thicknesses from approximately 0.75 mm to 4.0 mm and thirty-six distinct reload configurations, including curved-tip and proprietary, patented short-tip options.

47. Selecting a reload matched to the specific tissue is essential to proper staple formation, hemostasis, and the avoidance of tissue trauma. Using a reload that is not matched to the tissue can result in malformed staples, bleeding, leaks, or other complications. The FDA has said the same. In its Letter to Health Care Providers on the safe use of surgical staplers, the agency directed surgeons to "[h]ave a range of staple sizes available and select the appropriate size cartridge for the tissue type and thickness," warned that using a stapler "on tissue that is too thick or too thin for the selected staple size" "could result in staple malformation," and cautioned that "[i]f you have difficulty squeezing the handle of the stapler, you may need to select a different size staple." The FDA also instructed surgeons to "[c]heck to ensure that the staples are compatible with the stapler," noting that manufacturers use different color schemes to indicate staple sizes. A surgeon performing a multi-step procedure typically uses several different reloads, each matched to the tissue being divided, on a single handle. A universal handle stapling system should thus offer a

full, tailored range of reloads and a continuing supply of them. A device without that range is not a reasonable substitute.

48. A hypothetical monopolist of laparoscopic universal handle staplers in the United States could profitably impose a small but significant non-transitory increase in price because surgeons and hospitals would not, in response, switch in sufficient numbers to other devices to defeat the increase. That Medtronic can impose and sustain supracompetitive prices, as alleged herein, confirms the distinctness of the laparoscopic universal handle stapler market.

49. The market for laparoscopic universal handle staplers also exhibits the practical indicia of a distinct market or at least submarket, including: distinct physical and functional characteristics; distinct and specialized uses; recognition by industry participants, surgeons, and hospitals of these staplers as a distinct category; surgeon preference and platform-specific training; and distinct pricing and purchasing, under which hospitals contract for a platform and its continuing handles and reloads. These attributes stop buyers from switching to other products. In fact, Lexington has observed that hospitals will pay three to five times the contracted price for Medtronic's universal handle stapler rather than move to a non-universal handle stapler, such as the Ethicon platform discussed below.

50. Medtronic's share of the United States market for laparoscopic universal handle staplers is greater than 90%. Lexington's share of that market is less than 3%. Lexington's low share is the result of Medtronic's exclusionary conduct, which prevents hospitals and surgeons from evaluating and adopting the AEON products.

### 2. Other Surgical Staplers, Including Ethicon's Echelon Staplers, Are Not Reasonable Substitutes

51. Ethicon, Inc. sells staplers that are not laparoscopic universal handle staplers and are not part of the relevant market. Ethicon sells its laparoscopic linear cutters under the Echelon and Endopath brands together with their dedicated stapling cartridges.

52. Ethicon's Echelon and Endopath laparoscopic staplers are built on a different, proprietary architecture and do not use the universal handle reload system that defines the relevant market. Echelon stapling cartridges are not interchangeable with the Endo GIA, Signia, or AEON universal handles, and Endo GIA, Signia, and AEON reloads cannot be used in an Ethicon stapler. Rather than employing a single universal handle that accepts interchangeable reloads spanning multiple staple-line lengths, Ethicon configures its endocutters as separate, length-specific staplers (for example, the Echelon 3000 is offered as distinct 45 mm and 60 mm devices) using Ethicon's own stapling cartridge interface.

53. In the Ethicon design, the knife and anvil are carried in the handle and reused across every firing in a procedure, so the knife can dull and drag through tissue and the anvil can wear in ways that affect staple formation, whereas each universal handle reload supplies a fresh knife and fresh anvil for every firing. A blade reused across firings also carries the risks described above, including that exfoliated tumor cells and other material picked up on one firing can be transported to the next, and a blade that dulls over successive firings cuts less cleanly, increasing tissue trauma and bleeding along the staple line. An anvil reused across firings also carries risks described above, including inconsistent staple formation and hemostasis. A universal handle system, which discards the blade and anvil with each reload, avoids those risks.

54. The reloads found in the Lexington AEON product (or Medtronic Endo GIA or Signia products) are physically incompatible with the Ethicon Echelon stapler and its cartridges. The platform-specific character of these systems is also reflected in the reloads themselves: the staple heights of the conventionally color-coded reloads differ between platforms, so that reloads designed for one platform are neither mechanically nor clinically compatible with another platform. The difference in architecture also means that the Ethicon stapler lacks many types of reloads. For example, surgeons using an Ethicon platform do not have the option of curved-tip reloads in 45 mm or 60 mm lengths.

55. Hospitals and surgeons who buy and use laparoscopic universal handle staplers do not treat Ethicon's staplers as interchangeable with them. A small but significant, non-transitory increase in the price of universal handle staplers would not cause enough of those buyers to switch to Ethicon or other similar devices to make the increase unprofitable. The features of the universal handle platform described above, a fresh knife and fresh anvil with every firing, and the breadth of reloads available on a single handle, are not available with Ethicon's staplers. Many surgeons will not substitute a design that reuses the knife and anvil across firings because of the risks described above. Hospitals' own purchasing behavior shows that the two platforms are not substitutes.

56. Moreover, hospitals whose primary stapler supplier is Ethicon pay Medtronic's off-contract prices, three to five times its contracted prices, to have access to Medtronic's products. A price difference of that magnitude dwarfs any small but significant price increase, but does not induce substitution. In contrast, a hospital that has standardized on Medtronic's universal handle platform seldom maintains Ethicon stapler use, because surgeons who have the universal handle platform have no clinical reason to seek Ethicon's. Further, Medtronic raises the prices of its

access tiers, and imposes punitive pricing on hospitals that reject Medtronic's bundle, using the leverage of its bundle and power in the relevant market. Medtronic has also concluded internally that iterative innovation in stapling has peaked and diverted funds elsewhere, which is a decision that a firm facing a close substitute could not afford.

57. In addition, as noted above, Ethicon stapling cartridges are not interchangeable with the Endo GIA, Signia, or AEON universal handles, and Endo GIA, Signia, and AEON reloads cannot be used in an Ethicon stapler. When Lexington obtained FDA clearance for reloads designed to be interoperable with Medtronic's universal handles, Medtronic responded by warning hospitals against their use and, on information and belief, by requiring that its handles be used only with Medtronic reloads. That kind of reload-level rivalry, and Medtronic's reaction to it, exists only within the universal handle platform; there is no comparable interchange between the universal handle platform and Ethicon's. Accordingly, Ethicon's linear cutters are not part of the relevant laparoscopic universal handle stapler market.

58. Robotic surgical staplers are likewise outside the relevant market. Intuitive Surgical, Inc. sells the SureForm staplers (including 30 mm, 45 mm, and 60 mm models in 8 mm and 12 mm sizes) and the earlier EndoWrist Stapler. These products function only as instruments of Intuitive's da Vinci robotic surgical systems. They are sold, installed, and serviced exclusively for that system. A robotic stapler cannot be used as a handheld laparoscopic instrument, and a laparoscopic universal handle stapler cannot be used on a robotic system. The two are physically and commercially incompatible.

59. In addition, to use any robotic stapler, a hospital must first purchase and maintain a robotic surgical system costing $1 million to $2.5 million or more. Robotic surgical systems are also large and occupy substantial operating-room space. Because of this very large capital

investment and space requirement, a small but significant non-transitory increase in the price of laparoscopic universal handle staplers would not cause hospitals or surgeons to switch to robotic stapling. A hospital without a robot would not buy one in response to a modest increase in stapler prices, and surgeons cannot use robotic staplers except on the robot. Even a hospital that owns robots typically could not convert standard surgeries to robotic surgeries without buying more robots, expanding its space, and retraining its surgeons. Robotic staplers are therefore not reasonable substitutes for, and are not part of the same market as, laparoscopic universal handle staplers.

60. Other categories of surgical staplers are also not reasonable substitutes for laparoscopic universal handle staplers. Open linear and open linear cutter staplers cannot pass through laparoscopic trocars. Skin and fascia staplers cannot either; they close external wounds and have no application to internal minimally invasive transection or anastomosis. Circular "EEA" staplers perform a different function to address the circular anastomosis of tube-like organs. They cannot perform laparoscopic linear transection.

61. None of these products is reasonably interchangeable with laparoscopic universal handle staplers, and a hypothetical monopolist's price increase would not cause surgeons or hospitals to substitute them. The choice among these devices is dictated by the surgical approach and the anatomical task, not by price. A surgeon performing a laparoscopic procedure physically cannot deploy an open stapler through a trocar, cannot close an internal transection with a skin stapler, and cannot perform a linear transection with a circular EEA device. The alternatives simply do not work for the job.

62. Nor would a hospital convert minimally invasive procedures to open surgery in order to use open staplers in response to a small but significant non-transitory increase in laparoscopic

stapler prices. Doing so would sacrifice the shorter recoveries, lower complication rates, and shorter hospital stays that lead surgeons to choose minimally invasive surgery in the first place, at a cost that dwarfs any savings on the stapler itself. Because no amount of price pressure makes these products usable substitutes, a hypothetical monopolist of laparoscopic universal handle staplers could raise prices without losing sales to these other products.

**3. In the Alternative, the Relevant Market Is All Laparoscopic Staplers**

63. In the alternative, the relevant product market is all laparoscopic staplers in the United States. Such an alternative market would include both universal handle laparoscopic staplers (e.g., Medtronic and Lexington staplers) and non-universal handle laparoscopic staplers (e.g., Ethicon staplers).

64. Non-laparoscopic staplers fall outside this market: open linear staplers, open linear-cutter staplers, and skin and fascia staplers cannot pass through laparoscopic trocars, operate only in the open surgical field or to close external wounds, and have no application to intracorporeal, minimally invasive transection and anastomosis. A surgeon performing a laparoscopic procedure cannot substitute such a device, so a hypothetical monopolist of laparoscopic staplers could impose a small but significant non-transitory price increase without losing sales to non-laparoscopic staplers. Robotic staplers also remain outside this alternative market for the reasons stated above: they function only as instruments of a robotic surgical system, cannot be used as handheld laparoscopic instruments, and are not substitutes to which a hospital could turn in response to a price increase without first acquiring and staffing a robotic system.

65. Other tissue-management technologies (hand suturing, energy-based vessel-sealing and cutting devices such as ultrasonic and advanced bipolar instruments, and surgical clips) do not perform a stapler's defining function: in a single firing, cutting tissue while deploying multiple

rows of staples to form a secure, immediately hemostatic staple line across thick tissue. Surgeons do not regard those alternatives as substitutes in the transection and anastomosis procedures at issue, so a hypothetical monopolist could likewise raise prices without causing hospitals or surgeons to abandon stapling. Neither non-laparoscopic staplers nor non-stapling instruments are therefore reasonably interchangeable with laparoscopic staplers or part of this market.

66. Under the broader market definition of all laparoscopic staplers, Medtronic has a dominant share of the market and possesses monopoly power or at least significant market power for the reasons described below. Lexington's share of all laparoscopic staplers is even smaller than in the market for laparoscopic universal handle staplers.

#### 4. The United States Is the Relevant Geographic Market

67. The area in which Medtronic faces competition for the relevant products (and the only area from which U.S. hospitals can practically obtain alternative supply) is the United States. To sell surgical staplers to U.S. hospitals, a supplier must satisfy U.S. regulatory requirements and provide U.S.-based sales, clinical, contracting, logistics, and service support. A supplier offering the relevant products only abroad is not a viable alternative for U.S. hospitals. Hospitals could not practically turn to such products in response to a price increase. Such a supplier is therefore outside this market. The relevant geographic market is accordingly the United States.

### D. Medtronic Dominates the Relevant Market

68. Medtronic has monopoly power, or at a minimum significant market power, in the market for laparoscopic universal handle staplers.

### 1. Medtronic Controls an Overwhelming Share of the Market

69. Medtronic dominates the relevant market for laparoscopic universal handle staplers: it holds greater than 90% share and Lexington holds less than 3%, leaving the market highly concentrated and subject to little competitive discipline.

70. Even in a market of all laparoscopic staplers, Medtronic still possesses a dominant share of greater than 53%, which, combined with the entry barriers and other allegations below, gives Medtronic monopoly power in this alternative market as well.

### 2. High Barriers to Entry and Expansion Shield Medtronic

71. High barriers to entry and expansion ("market barriers") insulate Medtronic's market power. Chief among these market barriers, described more fully below, are Medtronic's own trade restraints, exclusionary practices, entrenched market position, and history of anticompetitive conduct.

72. The need to establish long-term agreements with GPOs, the gateway to customers, is a further market barrier. GPO agreements run for many years and are frequently renewed.

73. The need to build long-term sales relationships with hospitals further impedes entry. Cultivating such a relationship to the point of an actual supply contract can take two to five years or longer. Such relationships grow out of the customer's experience with a supplier's service team and its hands-on use of the technology. Medtronic's restrictive contracting keeps a new, more effective rival from developing those relationships and from earning the customer's comfort with its new technology. Medtronic, by contrast, holds those relationships and contracts nationwide, an incumbent advantage secured by its contract restraints, exclusionary practices, and entrenched position.

74. Regulatory requirements erect yet another market barrier. Before marketing, distributing, or selling medical devices in the United States, sellers must secure approval or clearance from government agencies, including the FDA.

75. Capital requirements pose a further barrier: manufacturers must invest heavily in facilities and machinery to reach the economies of scale needed to produce enough product to sell profitably at market prices.

76. Participation in this industry also demands a substantial portfolio of technology, intellectual property, and know-how, another barrier. A seller may need both to license intellectual property from others and to build a portfolio of its own.

77. The need to employ highly skilled professionals, including engineers, designers, and physicians, poses an additional barrier.

78. Brand recognition is another barrier. To participate in the market, a supplier must build an established brand that surgeons, hospitals, and GPOs trust. As explained above, developing that trust is extraordinarily difficult when the customer sits sealed off behind Medtronic's contract restraints, exclusionary practices, and entrenched position.

79. Switching costs are another barrier. As discussed, laparoscopic universal handle staplers sell as a platform with single-procedure handles and single-use reloads. Surgeons train on, and develop preference for, a particular platform's handle, reloads, and firing characteristics, so converting an institution to a different platform requires retraining, product evaluations, and changes to inventory and instrument sets. These features create meaningful switching costs.

80. Conversion happens only after time-consuming product demonstrations, training, and clinical trials. Nor can rivals compete for Medtronic's installed base at the reload level: when Lexington obtained FDA clearance for reloads designed to be interoperable with Medtronic's

universal handles, Medtronic responded by sending hospitals letters raising purported liability and compatibility concerns and, on information and belief, by requiring in its agreements that its handles be used only with Medtronic reloads.

81. Medtronic's long-term, staggered, and de facto exclusive agreements lock hospitals into Medtronic's portfolio for years, keeping rivals from competing for that volume even where their products are preferred and lower priced. Because Medtronic's agreements are lengthy and staggered, hospitals struggle to line up conversion opportunities across product categories, denying rivals a fair chance to compete.

82. These market barriers are the same whether the market is defined as laparoscopic universal handle staplers or more broadly to include all laparoscopic staplers.

### 3. Medtronic Possesses Monopoly Power in the Relevant Market

83. Medtronic's monopoly power is demonstrated by Medtronic's dominant market share, the significant barriers to entry and expansion described above, and the inability of existing rivals to expand their output in the short run, notwithstanding available capacity, because Medtronic's conduct forecloses their access to customers. If Medtronic imposed a small but significant non-transitory increase in price, or other onerous commercial terms its customers would not accept in a competitive market, it would face no realistic threat of losing meaningful sales to expansion or entry by any existing or potential rival. Direct evidence confirms the same conclusion: Medtronic profitably charges and sustains supracompetitive prices, can raise those prices without any corresponding cost increase, and excludes rivals, all without losing significant share.

84. Medtronic's dominant position in the broader alternative market bears the same hallmarks of monopoly power as in the market for laparoscopic universal handle staplers. Medtronic's share has been durable notwithstanding the presence of Ethicon because the barriers

to entry and expansion described above protect Medtronic in the broader alternative market just as they do in the narrower one. Hospitals that have purchased Ethicon often continue to buy Medtronic's products at off-contract prices several times higher than its contracted prices. Moreover, because Ethicon also engages in bundling, purported competition in a broader alternative market encompassing Ethicon would be based on the choice of one bundle or another, rather than product-level competition as to quality, performance, and price of stapling. Whatever arrangement a hospital may obtain by choosing one bundle over the other, both incumbents keep the profits they protect by denying a lower-priced, higher-quality stapler supplier the scale to compete.

85. Direct evidence also confirms Medtronic's power in the broader alternative market. Medtronic executes price increases on its access tiers to create leverage over hospitals. Medtronic also blocks product trials and conversions to the AEON Staplers. Medtronic has also concluded internally that "iterative innovation in stapling" has "peaked" and diverted funds elsewhere, a choice no firm disciplined by a vigorous rival could afford to make.

86. Medtronic's dominant and durable share, the high barriers to entry and expansion alleged above, its demonstrated power to raise portfolio prices and block trials, and its escalating exclusionary campaign against its most significant competitive threat together establish, at a minimum, a dangerous probability that Medtronic will acquire monopoly power in the relevant market and the alternative market.

**E. <u>Medtronic's Power Over the Bundle</u>**

87. Medtronic wields market power over the products in its bundles sufficient to move those products' prices up to the GPO "access" price whenever a hospital shifts its stapler purchases to a rival such as Lexington. The "access" price is the baseline penalty price set in Medtronic's

GPO agreements. Medtronic frequently charges at or above access prices across its bundle, proof that it holds the power to raise prices to that level. A hospital that rejects the bundle, or moves even one category like staplers to a rival, faces higher prices across Medtronic's entire portfolio. In Lexington's experience in the field, Medtronic's off-contract (access or list) prices run approximately three to five times its contracted prices, so that even a handful of units purchased at punitive pricing can disproportionately impact the hospital's spend.

88. Hospitals cannot escape Medtronic's market power by piecing together a competing bundle from other suppliers. An alternative bundle would require negotiating multiple separate contracts, ensuring consistent quality across categories, and bearing reputational risk. Further, Medtronic's staggered, non-coterminous contracts impose additional penalties that entrench the barriers to switching. No rival, including Lexington, sells the array of products across which Medtronic spreads its penalties, and no rival can replicate Medtronic's portfolio-wide pricing. Medtronic can thus exclude rivals through penalty pricing imposed across its bundle.

89. Medtronic also has a large and dominant share in the sales of the bundled products. For example, Medtronic's share is approximately 60% in monopolar devices and over 70% in advanced bipolar devices. Medtronic's position in these and other bundled product categories is protected by the same high barriers to entry and expansion discussed above. Such products require FDA regulatory clearance, large capital investments, long-term relationships with hospitals and GPOs, intellectual property and technology portfolios, and highly skilled personnel. Further, Medtronic is an adjudicated monopolist that harmed competition for advanced bipolar devices.

90. Lexington sells nothing close to Medtronic's portfolio. Lexington has no way to make hospitals whole for the penalty pricing they would incur across Medtronic's portfolio upon moving their stapler purchases to Lexington. Because Medtronic's portfolio-wide pricing is conditioned

on stapling commitments, choosing Lexington's staplers effectively costs a hospital a penalty assessed across products Lexington does not even sell. Because Lexington does not offer Medtronic's range of products, it cannot offer offsetting discounts to compensate hospitals for the penalties they would incur by switching.

### F. Medtronic's Exclusionary Conduct

91. Medtronic's anticompetitive conduct comprises mutually reinforcing exclusionary practices (each independently unlawful, and all deployed together) that operate at every stage of the hospital-contracting process. Medtronic blocks the product trials that competition for surgical products requires. Where a trial nonetheless succeeds, Medtronic's exclusionary bundling defeats the conversion, and its market-share-maintenance requirements and long-term, renewing commitments make each exclusion portfolio-wide and years-long.

#### 1. Medtronic Keeps Hospitals From Trialing Rival Staplers

92. Rivals cannot compete for a hospital's business without first completing product trials. Medtronic stops that step from ever occurring: hospitals are unable even to try Lexington's products because doing so threatens the hospital with portfolio-wide penalty pricing. At one hospital, Lexington was declared "no longer in consideration for a trial with the surgeons due to their bundled agreement with Medtronic." At another, the chief of thoracic surgery and his colleagues sought to evaluate the AEON Staplers and the local hospital approved a trial, but system-level personnel overrode that approval and refused the trial because of the hospital's contract with Medtronic. A third hospital refused to let a physician evaluate the AEON Staplers at all because it had "recently finalized" a "contract with Medtronic, which includes volume commitments and rebate obligations that are currently in effect," and introducing "vendors outside of Medtronic at this time could negatively impact our existing contract terms and financial

commitments." One hospital system refused a trial, explaining that it was at approximately 95% compliance with Medtronic and could not conduct a meaningful trial. At another, after a prominent surgeon was denied a trial, he described the chill in his own words: "Every time I submit for a new product, I'm put under a microscope and have 10 people talking to me about how I'm stepping on toes . . . [the hospital's] Medtronic contract makes the process of getting new product in so difficult it outweighs the benefit."

93. In contrast, when Lexington has been allowed to trial its products, the results speak for themselves. For example, the chief of thoracic surgery and two colleagues at one hospital rated the AEON Staplers "clinically superior" in 89% of cases over a three-month, approximately 28-case trial.

94. Medtronic's conduct has blocked or cut short evaluations or purchases of Lexington products at numerous other hospitals and health systems. A cancer center with thoracic surgeons who reported air-leak problems in their Medtronic cases reported that "due to the existing contract structure, there is not a pathway for them to trial an alternative stapling platform." Another hospital system's value-analysis team denied a surgeon's trial request in November 2025 because of Medtronic's contract. Surgeons at two other hospitals, one of whom was experiencing leaks in his pancreatic cases with Medtronic's product, reported that they could not trial another stapling platform due to the hospital's current contract with Medtronic.

95. Medtronic's now-public documents confirm that it blocks trials by design. Medtronic instructs its sales force that if "accounts begin competitive trials," it should "communicate violation of our pricing agreements and be prepared to take them to access/list tier." Other documents describe taking steps to "eliminate the competition from getting a window that would allow for a trial." A hospital that contemplates evaluating the AEON Staplers faces penalty pricing

spanning many Medtronic products. Lexington cannot match Medtronic's portfolio-wide penalties because Lexington sells stapling products, not the entire suite of products that Medtronic uses as economic leverage.

96. Medtronic's high market-share commitments also block trials. Medtronic's agreements require 80% or 90% or higher compliance. The volume left over is too small to acquire enough of a competing product for a meaningful trial. Specialty and surgeon-preference items typically absorb what little leeway remains. As a result, in practice a hospital under a Medtronic agreement cannot evaluate the AEON Staplers or other rival products at all during the agreement's term.

97. A rival also must spend significant time building a relationship with a hospital before any trial can occur. Rivals therefore cannot blanket many hospitals at once; each trial opportunity takes dozens or hundreds of hours to earn. Hospitals operating under Medtronic agreements commonly take six to nine months or longer even to authorize a trial, and surgeons, who have repeatedly seen administrators reject products that compete with an incumbent contract, often abandon the effort or decline to initiate requests at all. Even where some at a hospital want a trial, others, such as the purchasing department, block it for fear of Medtronic retaliation. And when fear alone does not stop a trial, Medtronic often explicitly threatens penalty prices to shut it down.

98. Trials are also extraordinarily resource-intensive, so each one Medtronic blocks inflicts an outsized loss. Conducting a single hospital trial of a competing device can take weeks to months, involve fifteen to twenty people, require dozens of hours of work per participant, and cost on the order of several hundred thousand dollars.

99. By preventing or terminating trials, Medtronic thus imposes enormous costs on rivals and hospitals, ensuring that surgeons never gain the clinical experience necessary to convert, so

that hospitals renew their Medtronic agreements without any meaningful competitive process and the foreclosure persists through successive renewals. Through such conduct, Medtronic stops competition before it can start, blocking a potential conversion before a hospital can even evaluate a rival product.

**2. Medtronic's Exclusionary Bundling Blocks Conversion**

100. Even when a trial occurs and is successful, the rival still cannot displace Medtronic because Medtronic uses exclusionary bundling to make the deal impossible to close. Where a competing device performs well in a trial and the evaluating surgeons approve it, Medtronic uses portfolio leverage and pricing penalties to block conversion. This happens even at leading academic medical centers and cancer hospitals. Medtronic thus overrides clinical merit and surgeon preference, a particularly serious matter in procedures where the choice of stapler can significantly affect patient outcomes, including oncologic procedures.

101. Lexington has been foreclosed by this exclusionary conduct at hospital after hospital. One hospital conducted a successful trial of Lexington's products but then told Lexington that it "would not be able to move forward with Lexington staplers due to their contracted Medtronic bundling agreement." At another, after surgeons rated the AEON Staplers "clinically superior" in 89% of trial cases, and despite Lexington's lower cost, the hospital declined to proceed because of its Medtronic "contract obligations." At another, the hospital, dissatisfied with Medtronic's stapler, switched to Lexington after a successful trial, approved Lexington through its value-analysis process, and stocked the product. It then abruptly stopped doing business with Lexington because its "bundled agreement with Medtronic" meant that buying from Lexington "would affect their rebate and cause an increase in other categories." A thoracic surgeon at another hospital documented better patient outcomes and significantly shorter hospital stays with the

AEON Staplers at a lower price, but the hospital refused even a limited carve-out for him and one partner by explaining that Medtronic had threatened to raise prices on other products by approximately $2 million if the carve-out were permitted. At another hospital, a surgeon who had been using the AEON Staplers informed Lexington that "due to their current bundle agreement with Medtronic" he "would no longer be able to use our stapler." At another hospital in a national health system, a trial in which the cases "went perfect" was followed by a value-analysis denial "right away" that "cited a Medtronic contracted bundle agreement."

102. Medtronic leverages its portfolio to prevent a conversion by eliminating any savings offered by a rival. In now-public documents, Medtronic touts that this strategy makes it "impossible" for a rival to close deals. Medtronic's bundled agreements make discounts, rebates, and pricing tiers contingent on a hospital's purchases spanning multiple product categories, including staplers, monopolar devices, advanced bipolar devices, and other surgical products. The bundled discount is not a simple volume discount on staplers. It is a portfolio-wide mechanism to protect Medtronic's stapling share from competition. Lexington thus must offset discounts and penalties across products it does not sell, making effective competition impossible even where its stapling products offer superior value. Medtronic's now-public "Creative Contracting Strategy" confirms that this cross-category design is deliberate: a Medtronic "Protect the House" presentation aimed at "[d]efending" Medtronic's business directed the sales force to "[b]undle COTs (Energy, Endo, Hernia, etc)."

103. Given the high volume and total cost of the bundled products, the aggregate exclusionary "discount" on them is very significant. A hospital receives that so-called "discount" on the other products only on the further condition that it purchase Medtronic's stapling products. Hospitals have indicated to Lexington that no price it could quote would offset the bundled

exclusionary discount. Allocating the bundle-wide exclusionary "discount" to Medtronic's stapling devices, the products on which Lexington seeks to compete, results in the effective price of Medtronic's stapler products falling below an appropriate measure of Medtronic's cost, including its average variable cost. Medtronic's pricing thus fails the discount attribution test. Medtronic's conduct is not a simple above-cost price cut on one product. It is a portfolio-wide bundled "discount" that threatens hospitals with penalty prices.

104. Nor does the unlawfulness of Medtronic's bundle turn on the relationship between the price of any single product and its cost. What makes the bundle exclusionary is the condition attached to it. Medtronic grants or withdraws discounts, rebates, and pricing tiers on monopolar, advanced bipolar, hernia, suture, and other products according to whether the hospital buys its staplers from Medtronic. And it backs that with multi-year purchase commitments, compliance audits, the forfeiture of rebates, and the threat of terminating the entire agreement. It is that cross-product condition and the coercion behind it, not the level of any one price, that prevents hospitals from buying a better, lower-priced stapler from a rival. An equally efficient or more efficient rival cannot meet that bundled price by competing on the merits because the rival does not sell the other products across which Medtronic spreads the so-called "discount."

105. Medtronic's bundled differential operates as a penalty, not a true discount. Medtronic inflates its non-bundled prices above competitive levels and then offers "discounts" that do not bring those prices back to competitive levels, so that even its "discounted" prices remain supracompetitive. Medtronic's now-public documents confirm that it raises prices deliberately, as leverage. For example, Medtronic celebrated "executing a price increase on the 'access tiers'" of its agreements and explained that the increase would "provide [it] further leverage" to push customers toward further commitments to achieve "better pricing."

106. Customers do not demand such bundles for efficiencies. The hospitals and GPOs that accept them do so because Medtronic conditioned the pricing on the customer taking the bundle. Those are not the marks of a buyer freely choosing exclusivity to secure a better price.

107. Hospitals and GPOs have told Medtronic they did not want a bundle and instead wanted the product categories "parceled out" so they could evaluate each category individually. Medtronic well understands the impact of being forced to compete as to particular products. One of Medtronic's regional sales executives worried that breaking up the categories would expose Medtronic by giving customers "more choice" and "more options." More choice and more options are the aims of the antitrust laws.

**3. Market-Share-Maintenance Requirements and Long-Term Commitments Magnify the Exclusion of Rivals**

108. Medtronic's agreements also require hospitals to maintain a high share of their purchases from Medtronic across numerous product categories (commonly 80%, 85%, 90%, or higher) for the multi-year term of the agreement. One exclusion of rivals thus results in a years-long exclusion. Medtronic structures these commitments as market-share percentages, minimum volume requirements, and rebate conditions, so that a hospital's rebates and pricing across the portfolio hinge on continued compliance in every category.

109. Hospitals use those very terms to describe the resulting lock-in. One hospital would "not allow other surgeons to use [Lexington] for fear of missing their rebates with the Medtronic bundled agreement they have in place." Another refused to evaluate the AEON Staplers because its Medtronic contract "includes volume commitments and rebate obligations that are currently in effect." One hospital system reported that it was at approximately 95% compliance with Medtronic and declined to permit a meaningful trial. And another told a surgeon that the system

stood at precisely 80% compliance, and that any use of Lexington would drop compliance to approximately 78% and would not be permitted.

110. Medtronic's contracts are long term and difficult to terminate in practice. Terminating a Medtronic agreement is difficult because of the penalty pricing that would result from termination. Medtronic also uses contract terms that extend beyond the end of other contracts and non-coterminous arrangements that make it difficult to switch to a new supplier, so that by the time one contract expires another is still in place. Medtronic's chief executive has touted to investors that Medtronic has "very tight contracts that have been tested over time," such that even if Medtronic has "a supply shortage" and "a competitor takes up that" business, Medtronic gets "that supply back" and is "right back to where we were based on the contract."

111. Medtronic's agreements typically run at least three years and are extended, renewed, and layered. Because hospitals cannot trial or convert mid-term, they routinely renew without ever considering rivals, so the foreclosure outlasts any single term and becomes effectively perpetual. The long lead times needed to evaluate, train on, and adopt a new stapling platform compound the foreclosure. Each renewal extends the exclusion before any rival can establish itself. A hospital cannot buy meaningful volumes from Lexington without substantial risk of losing discounts across Medtronic's portfolio because falling below the 80% or 90% commitment exposes the hospital to portfolio-wide penalties.

112. Medtronic's now-public documents demonstrate the strength of Medtronic's contracts. Medtronic described its own agreement that "ties in all COT's into one large agreement" such that "[c]reep on any of them puts their 5% wrap in serious jeopardy," calling it as "'iron clad' as an agreement can get." Other documents celebrate using Medtronic's agreements to "lock[] down [customers] for years to come" and to "widen the moat around [its] business."

113. The cumulative result of Medtronic's conduct is long-term de facto exclusive dealing. Through high commitment thresholds, compliance audits, portfolio-wide pricing penalties, staggered expiration dates, and the threat of revoking discounts across every category, Medtronic prevents hospitals from purchasing meaningful stapler volumes from Lexington for years at a time. Medtronic's bundled, portfolio-wide penalties thus make any meaningful purchasing from competing suppliers economically prohibitive and require hospitals, in practice, to obtain all or substantially all of their stapler requirements from Medtronic. Medtronic's agreements are thus truly exclusive dealing agreements. They are exclusive in operation and effect. Lexington's experience in the field confirms this, with numerous hospitals reporting purchasing 95% to 99% of their products from Medtronic and systems reporting that all surgeons are using Medtronic's products.

114. Staggered expiration dates across product categories also mean a hospital can rarely, if ever, reach a coterminous window in which it could move its stapler purchases to a rival without forfeiting bundled discounts on categories still under contract. The practical period of exclusivity thus extends well beyond any stated term, with no short, meaningful notice-of-termination exit that would give rivals periodic opportunities to compete. A hospital that attempts to exit a Medtronic agreement before the end of its term faces punitive price increases in the form of forfeited bundled discounts and rebates across the portfolio.

115. Medtronic enforces these commitments through compliance forms and audits. Hospitals must report their purchase records, which Medtronic monitors to verify market-share compliance and to spot purchases from rivals. Medtronic keeps the discretion to judge compliance and, if a hospital fails to trend toward compliance in any single category, to terminate the whole agreement and strip its so-called discounts from every category.

116. Medtronic's commitments are not price tiers that a hospital may disregard at will. A hospital that signs a local Medtronic agreement, or elects a committed tier under a Medtronic GPO agreement, undertakes an affirmative, multi-year obligation to purchase the required share of its needs from Medtronic across the covered categories. So-called discounts across the bundle and rebates are earned only if the hospital remains in compliance over the measurement period. A hospital that falls out of compliance in any one category, or merely fails to trend toward meeting its commitments according to Medtronic's discretionary judgment, faces contract termination followed by punitive price increases across the bundle. Such hospitals stand to lose rebates attributable to Medtronic products they have already purchased and paid for. As a result, hospitals have repeatedly told Lexington they cannot switch or even try Lexington's products. For example, hospitals have told Lexington that they could not let surgeons use the AEON Staplers "for fear of missing their rebates with the Medtronic bundled agreement they have in place," and that buying from Lexington "would affect their rebate and cause an increase in other categories." The commitment, the audit, and the forfeiture together leave a hospital no economically rational way to switch to a rival without facing punitive price increases across Medtronic's extensive bundle.

**4. Medtronic's Combined Conduct Excludes Rivals**

117. Medtronic's categories of conduct work in concert, each amplifying the others. Medtronic stops product trials regardless of whether the trial would violate the specific terms of any Medtronic agreement. Medtronic's market-share-maintenance requirements also furnish leverage that blocks trials at the outset. No hospital can afford to put its portfolio-wide pricing at risk merely to evaluate a single competing product. If a trial happens and succeeds anyway, Medtronic uses exclusionary bundling with punitive pricing to defeat the conversion by ensuring portfolio-wide penalties make it impossible for a rival to compete. Medtronic's long-term de facto

exclusive agreements, with market-share requirements and compliance audits, then transform each defeat into multi-year exclusion. The long-term, staggered, and renewing agreements extend that exclusion indefinitely. Absent an injunction, Medtronic will keep monopolizing and restraining trade in the relevant market, thereby harming hospitals and shutting out rivals to preserve its monopoly position. Indeed, Lexington's experience in the field indicates that Medtronic is becoming more aggressive in its exclusionary conduct. That includes using the threat of portfolio-wide penalty pricing to stop hospitals from trialing rival products, using bundled pricing and rebates conditioned on stapling purchases to block conversions even after a rival's product has proven superior in a trial, and using high market-share commitments, compliance audits, rebate forfeiture, and long-term, staggered, and renewing agreements to turn each exclusion into a years-long one. Medtronic's conduct is ongoing and it is intensifying.

**5. Medtronic's Targeting Enhances Foreclosure**

118. Medtronic singles out hospitals where rivals are gaining traction. Medtronic's ability to identify and target the specific accounts where a rival is competing means its conduct forecloses competition well beyond what raw market share reach alone would suggest. Blocking a rival at every account where it has a genuine opportunity to convert business results in foreclosure of the rival across the entire market.

119. Medtronic's now-public documents confirm this strategy. It uses "portfolio leverage" in "at-risk accounts and targeted conversion accounts." Having defeated a rival at particular accounts, Medtronic personnel recounted how Medtronic's proposition leveraged the entire Medtronic portfolio to "close the gap" on the savings the rival could offer on only one product category. Medtronic's own sales objectives confirm this intent, directing the sales force

to "[d]efend key share leadership positions, especially in Endostapling," to "[l]everage the full portfolio to . . . mitigate losses and realize gains in key accounts."

**6. Medtronic Has No Legitimate Business Justification**

120. No legitimate business justification exists for Medtronic's practices, each unlawful and all cumulatively deployed to restrain trade and to monopolize, or attempt to monopolize, the relevant market. And even if some legitimate business purpose lay behind any of these practices, Medtronic could readily achieve that purpose through less restrictive means free of the same anticompetitive effects.

121. Medtronic's conduct neither constitutes competition on the merits nor is reasonably necessary to any such competition. Competition on the merits includes a superior product, lower prices, greater efficiency, or business acumen. None of these explains how Medtronic maintained or enhanced its dominant share. Instead, Medtronic did so through exclusionary bundling, de facto exclusive dealing, market-share-maintenance requirements, and the blocking of product trials. These practices do not make Medtronic's stapling products better or cheaper. Nor do they benefit hospitals, surgeons, or patients.

122. Instead, Medtronic's conduct makes a significant contribution to creating, maintaining, and enhancing Medtronic's monopoly power. Medtronic's conduct forecloses a substantial share of the relevant market and denies rivals like Lexington the trials, conversions, and scale needed to discipline Medtronic's prices. Such conduct thus binds hospitals to Medtronic's portfolio for years. To keep its monopoly, Medtronic deals in ways that exceed ordinary business needs and skill, excluding competition unnecessarily.

123. Even assuming the bundles generated some genuine efficiencies, Medtronic could attain any such efficiencies through substantially less restrictive means. Medtronic could, for

instance, carve out from its bundled commitments and pricing penalties those product categories in which a non-full-line supplier like Lexington competes. Medtronic's bundling is accordingly not necessary to achieve any legitimate efficiency.

124. Nor is the power of such a carve-out theoretical. In the past, Ethicon unbundled a trocar product and issued a carve-out so that hospitals could purchase it independent of the bundle. The non-full-line rival's share then grew significantly in the years that followed and market-wide prices eventually fell. This real-world example demonstrates that the bundle is what forecloses competition, and a carve-out would help restore it.

125. Medtronic itself acknowledged that a carve-out powered a previously excluded rival's growth in the trocar market. One now-public Medtronic document noted that "'carve out' language that protect[ed] non-full line suppliers" "fueled" the "growth" of a previously excluded trocar supplier into becoming the market leader. The document also charted a market-wide decline in average sales price in the years that followed translating into hundreds of millions of dollars in annual customer savings.

126. Each element of Medtronic's conduct, and all of it together, mutually reinforces the rest, harming and foreclosing competition in the relevant market in an unnecessarily restrictive way. By shutting out rivals, Medtronic's conduct blocks the basic ends competition serves: lower prices, better products, and more efficient production methods. Medtronic's conduct preserves Medtronic's supracompetitive prices in place of the lower prices that competition would produce, prevents hospitals and surgeons from adopting Lexington's better-performing AEON products, and deters investment in improved stapling technology. And it shields Medtronic from a rival that offers comparable or superior products, which dulls the incentive to compete by becoming more efficient. The scheme is ongoing, and so is the harm it inflicts on Lexington and on consumers.

Taken as a whole, the conduct amounts to a scheme designed to preserve Medtronic's monopoly power in the relevant market, or, in the alternative, one creating a dangerous probability that Medtronic will acquire that power.

## G. Medtronic's Conduct Results in Harm to Competition and to Consumers

### 1. Medtronic Harms Competition and Substantially Forecloses the Market

127. As set forth above, Medtronic commands a greater than 90% share of the relevant market and has entered long-term agreements that have foreclosed competition. That conduct denies customers the choice of, and access to, better surgical devices, and cuts competitors off from hospital purchasers.

128. Medtronic's agreements foreclose a substantial share of the relevant market for long and extended periods because hospitals are locked into Medtronic's portfolio for years and routinely renew without considering rivals. Operating against the entry and expansion barriers described above, Medtronic's agreements leave too little of the market open for a rival like Lexington to reach the scale needed to drive prices down. A stapler manufacturer must recover substantial fixed costs of engineering, regulatory compliance, automated manufacturing, and clinical and field support across its volume. Further, as alleged below, Lexington's U.S. facility operates below its designed capacity because the foreclosed volume is unavailable to it. Nor can a foreclosed rival simply wait out the agreements because they are renewed, extended, and layered before any meaningful window opens. Medtronic's targeting heightens the foreclosure, and its duration exceeds the nominal length of any single agreement.

129. Medtronic's foreclosure of competition in the United States stands in stark contrast to Europe, where Lexington has made significant sales because of the tender process that limits bundling. In the United States, Lexington has a share of less than 3% whether measured as a share

of the relevant market or of all U.S. laparoscopic stapler sales. Lexington's sales are far higher in Europe and Lexington's market share is in the double digits.

130. Lexington has run into the anticompetitive conduct alleged here at hospitals across the country. Customers who have told Lexington that Medtronic contracts barred them from purchasing Lexington's products include, by way of example: Ascension, BayCare (St. Joseph's Hospital, Mease Countryside Hospital, and Morton Plant North Bay Hospital), BJC Health System, Brigham and Women's Hospital, Community Memorial, Dell Seton Medical Center, Duke, Hackensack, Moffitt Cancer Center, Nebraska Medicine, Saint Louis University Hospital, St. Bernardine Medical Center, Stanford, UCLA, UPMC, and Wellstar.

131. Hospitals have given Lexington reasons like the following for declining to purchase the AEON Staplers:

- A thoracic surgeon found that the AEON Staplers delivered better patient outcomes and significantly shorter hospital stays, at a lower price than Medtronic. He spent well over a year seeking a limited carve-out so that he and one partner could use them. The hospital refused, explaining that Medtronic had threatened to raise prices on other products by approximately $2 million if the carve-out were permitted; that the system stood at precisely 80% compliance with its Medtronic agreement; and that allowing Lexington would reduce compliance to approximately 78%.
- Over a three-month, approximately 28-case trial, the chief of thoracic surgery and two colleagues scored every case on evaluation sheets and rated the AEON Staplers "clinically superior" in 89% of cases. Lexington's product also cost less. The hospital nonetheless declined to proceed, citing its Medtronic "contract obligations."

- After a successful trial, the hospital told Lexington that it "would not be able to move forward with Lexington staplers due to their contracted Medtronic bundling agreement."
- The hospital refused to let additional surgeons use the AEON Staplers, explaining that it would "not allow other surgeons to use [Lexington] for fear of missing their rebates with the Medtronic bundled agreement they have in place."
- On the day of a hospital's value-analysis-committee meeting, Lexington was "taken off the agenda" and declared "no longer in consideration for a trial with the surgeons due to their bundled agreement with Medtronic."
- After the hospital denied a prominent surgeon's requests to trial the AEON Staplers, he described the exclusion in his own words: "Every time I submit for a new product, I'm put under a microscope and have 10 people talking to me about how I'm stepping on toes . . . [the hospital's] Medtronic contract makes the process of getting new product in so difficult it outweighs the benefit."
- Dissatisfied with Medtronic's stapler, the hospital successfully trialed the AEON Staplers. The hospital approved Lexington through its value-analysis process, added Lexington as an approved vendor, and stocked the product on its shelves. It then abruptly stopped doing business with Lexington, explaining that its "bundled agreement with Medtronic" meant that buying from Lexington "would affect their rebate and cause an increase in other categories." The product was pulled from the shelves overnight after Medtronic issued an ultimatum.
- The system told Lexington that it was running at approximately 95% compliance with its Medtronic agreement and declined to permit a meaningful trial.

- The hospital refused to let a physician evaluate Lexington because it had "recently finalized" a "contract with Medtronic, which includes volume commitments and rebate obligations that are currently in effect" and introducing "vendors outside of Medtronic at this time could negatively impact our existing contract terms and financial commitments."
- The chief of thoracic surgery and his colleagues at a hospital wanted to evaluate the AEON Staplers, and their hospital initially approved a trial. System-level personnel then overrode that approval and refused to allow the trial because of the hospital's contract with Medtronic. A surgeon at another hospital in the system, interested in Lexington's short-tip reload, took a trial request to the value-analysis committee and was denied approval of a trial based on the system's committed Medtronic contract.
- After a thoracic surgeon at a hospital discussed trialing the AEON Staplers and raised it internally, the hospital decided that "due to their bundled agreement with Medtronic" it "would not be able to proceed based on commitments."
- A cancer center's thoracic surgeons told Lexington they had been experiencing air-leak problems with Medtronic in their cases, but "due to the existing contract structure, there is not a pathway for them to trial an alternative stapling platform."
- A hospital system's value-analysis team denied a surgeon's trial request in November 2025 because of Medtronic's contract. Surgeons at two other hospitals in the same system, one of whom had been experiencing leaks in his pancreatic cases, likewise reported that they could not trial another stapling platform because of the hospital's Medtronic contract.

- At another hospital, a surgeon's request to trial the AEON Staplers was denied because of Medtronic, with the hospital "advised to not move forward with an evaluation."
- At another hospital, a surgeon who had been using the AEON Staplers informed Lexington in August 2023 that "due to their current bundle agreement with Medtronic" he "would no longer be able to use" Lexington's "stapler."
- At another hospital, a surgeon completed trial cases that "went perfect," but the value-analysis committee then denied Lexington "right away," citing "a Medtronic contracted bundle agreement for their denial despite interest and desire of the surgeon to use" Lexington's "stapler."

132. Medtronic's conduct has foreclosed competition in over 70% of the U.S. relevant market. The foreclosure is real, substantial, and long-lasting. Because Medtronic's agreements run for multiple years on staggered and renewing terms, the foreclosed share stays foreclosed year after year, preventing hospitals from gaining access to Lexington's clinically superior products.

**2. Medtronic's Conduct Produces Supracompetitive Pricing**

133. Medtronic's conduct produces supracompetitive prices. Lexington's AEON products fulfill the same functions, offer comparable or superior features, and provide performance better than or equal to Medtronic's competing staplers. Absent Medtronic's conduct, Lexington could sell them to hospitals at a lower price, which would drive down Medtronic's prices. In non-U.S. markets where Lexington has offered a lower price, Medtronic has responded by lowering its own prices. For example, in an Australian public tender, Lexington's stapler prices came in approximately 17% below Medtronic's prices, which forced Medtronic to reduce its prices. Absent Medtronic's exclusionary conduct, Medtronic could not sustain its pricing because it would lose too much business and have to lower prices.

### 3. Medtronic's Conduct Causes Diminished Choice, Suppressed Innovation, Inferior Products, and Higher Costs for Rivals

134. Medtronic's conduct also leaves hospitals with fewer choices and inferior products. As discussed, many hospitals have told Lexington that they cannot purchase its products because of Medtronic's bundling. The resulting absence of competition has resulted in inferior product designs and stagnating innovation for customers. The stagnation is visible on the product itself: more than a decade after Medtronic acquired Covidien, the Medtronic stapling product still bears the Covidien name, logo, and design. And Medtronic's stapler-related patent activity has declined materially. Hospitals and surgeons who would otherwise evaluate or buy the AEON Staplers are deterred or blocked, and patients lose the benefits that competition among surgical stapling technologies would deliver. But for the foreclosure, competitors would have more incentive to invest in capturing share, and that competition would improve product quality, increase innovation, and lower prices. Indeed, hospitals bound by Medtronic's commitments continue to buy a product that is clinically inferior and that their own surgeons have rated inferior in head-to-head evaluations. Surgeons at those hospitals who asked to evaluate the AEON Staplers to address clinical problems in their cases were refused, and the quality of products available to patients in the relevant market is reduced as a result.

135. Medtronic's conduct has also raised rivals' costs, including the cost to perform product trials that cannot result in a conversion because of Medtronic's exclusionary bundled pricing. In addition, to win business, Lexington must beat more than Medtronic's stapler price. It must also overcome the threatened loss of portfolio-wide pricing on monopolar devices, advanced bipolar devices, and many other products. That penalty structure prevents competition on the merits. Absent the scheme, rivals would have won greater sales with cheaper or superior products

and lowered their costs through access to the most efficient inputs and distribution. Greater economies of scale, innovation, and learning would in turn have brought them larger market shares and resulted in lower costs and prices.

136. Lexington designed its current U.S. production facility to produce a significant volume of reloads per day. Because Medtronic's conduct suppresses Lexington's U.S. sales, the facility operates at far less than that capacity, forcing Lexington to absorb its fixed manufacturing overhead across far fewer units. With volume to justify further automation, Lexington could substantially reduce labor time required for reloads. The foreclosure thus operates in a self-reinforcing cycle: Medtronic's conduct denies Lexington the sales that would fund the automation and scale that would lower Lexington's costs and prices and make it a stronger rival.

137. Medtronic's conduct also reduces innovation. If an incumbent can stop trials and adoption with bundled penalties rather than product performance, entrants and smaller innovators cannot justify continued investment in improved stapling technology. Indeed, Medtronic's monopoly has blunted its incentive to innovate. A now-public Medtronic "Strategic Runway" presentation expressly asked how much room Medtronic has to "innovate" in stapling. The presentation concluded that "iterative innovation in stapling" has "peaked," that Medtronic's products "continue increasing in cost without providing proportional increase in outcome improvement," and that Medtronic had "diverted funds" to fund robotics and other priorities.

138. Medtronic's suppression of innovation is clear. Since launching in 2018, Lexington has advanced through roughly a dozen product generations and secured more than 40 issued and pending patents. It introduced frequent improvements, including a powered handle that reads tissue resistance and adjusts firing in real time and a series of specialized reloads, which experienced surgeons describe as bringing decades-old stapling practice to a new level. By

foreclosing adoption of these improvements, Medtronic keeps those benefits from surgeons and patients. And it discourages continued investment by Lexington and other entrants.

**4. Medtronic's Conduct Has No Procompetitive Benefit**

139. Nothing about Medtronic's exclusionary conduct is procompetitive. Medtronic's conduct has no legitimate business purpose. It does nothing to improve Medtronic's efficiency or its staplers, has not enhanced consumer appeal or delivered better products to hospitals or hospital systems, and provides no benefit to consumers. Nor has the conduct produced lower prices. Medtronic inflates its prices above competitive levels, then extends so-called "discounts" that still leave prices supracompetitive. As a result, the "discounted" prices are not true discounts and deliver no actual savings to consumers relative to the prices hospitals would pay if rivals could compete for stapler volume on the merits. And, as discussed above, even if the bundles provided procompetitive benefits, a carve-out for categories in which a non-full-line supplier like Lexington competes would achieve any such benefits. Thus, Medtronic's conduct is not reasonably necessary to achieve any legitimate efficiency.

**H. Lexington's Injury and Standing Under the Antitrust Laws**

**1. Lexington Suffered Antitrust Injury**

140. The anticompetitive aspects of Medtronic's conduct have directly caused Lexington losses. Medtronic has substantially foreclosed competition through the conduct discussed above, has monopoly power in the relevant market, and employs anticompetitive practices that serve only or principally to impede Lexington and other rivals from offering competitive products.

141. Because Lexington seeks to compete directly in the relevant market, its injuries are of the kind the antitrust laws were meant to prevent and flow from the very features that make

Medtronic's acts unlawful. Lexington satisfies every element of antitrust injury. Medtronic's actions injured Lexington, those actions violate the antitrust laws, and the injury is of the type such violations inflict on competition itself.

142. The conduct that causes Lexington's lost sales is the same conduct that harms competition in the relevant market. Medtronic's conduct has foreclosed rivals and, as a result, raised prices, reduced output, limited choice, and suppressed innovation. Ordinary competition did not produce this injury, and no procompetitive feature of Medtronic's conduct did either. The injury is, rather, the result of Medtronic's foreclosure of competition. Lexington's harm exists because, and to the extent that, Medtronic's exclusionary conduct forecloses competition on the merits. Lexington's injury does not flow from lower prices. The differential between Medtronic's bundled and unbundled prices is a penalty for buying elsewhere rather than a real price cut. Hospitals that wish to buy the AEON Staplers at a lower price than Medtronic's are prevented from doing so. Lexington's lost sales are therefore the product of foreclosure, not of Medtronic offering hospitals a better bargain. That same foreclosure raises the prices hospitals pay and reduces the quality and choice available to them.

143. The alleged anticompetitive conduct has caused Lexington to lose profits from the sale of stapling products to hospitals, including ongoing sales of staple reloads. Medtronic has foreclosed a substantial portion of the market and many customers never so much as consider Lexington's products. As recounted above, hospital after hospital has told Lexington that Medtronic contracts and conduct have made purchasing Lexington's products impossible. Such hospitals include, for example, Ascension, BayCare (St. Joseph's Hospital, Mease Countryside Hospital, and Morton Plant North Bay Hospital), BJC Health System, Brigham and Women's Hospital, Community Memorial, Dell Seton Medical Center, Duke, Hackensack, Moffitt Cancer

Center, Nebraska Medicine, Saint Louis University Hospital, St. Bernardine Medical Center, Stanford, UCLA, UPMC, and Wellstar.

144. Medtronic's suppression of Lexington's technology has also damaged Lexington's brand and goodwill. By largely succeeding in keeping Lexington from competing, Medtronic keeps Lexington from showcasing its superior products to potential customers and from proving to surgeons that its devices outperform, and cost far less than, Medtronic's devices. Each of these losses is an antitrust injury. They are proximately caused by the anticompetitive aspects and character of the conduct and reflect the same competitive harm that Medtronic's violations work in the relevant market. Lexington will demonstrate the full extent of its losses at a later stage of these proceedings.

**2. Lexington Has Standing**

145. Many grounds establish Lexington's antitrust standing. Lexington has suffered antitrust injury, as alleged above. Lexington sells the relevant products and has forgone profits on their sale in the relevant market, including on ongoing staple-reload sales. Its efforts to persuade hospitals to evaluate and purchase its staplers are continuous and extensive. Medtronic's anticompetitive practices have directly inflicted substantial and continuing losses on Lexington.

146. First, a direct causal connection links Medtronic's antitrust violations to Lexington's harm. Medtronic's exclusionary bundling, de facto exclusive dealing, market-share-maintenance requirements, and trial-blocking conduct are the direct cause of Lexington's lost sales because they prevent sales to the very hospitals that would otherwise evaluate and adopt the AEON Staplers.

147. Second, improper motive drives Medtronic's conduct. Lexington's superior, lower-priced products present a threat to Medtronic's dominance. Medtronic has directed its

exclusionary conduct at Lexington with the specific intent to foreclose Lexington from the relevant market and to cause Lexington harm, including by offering additional bundled discounts on the condition that customers immediately cease evaluating Lexington's products.

148. Third, Lexington's injury is of exactly the character Congress enacted the antitrust laws to redress. As alleged above, Lexington's antitrust injury consists of losses flowing directly from the anticompetitive aspects of Medtronic's conduct, not from any superior efficiency, lower price, or better product on Medtronic's part. Despite offering clinically superior products at lower prices, Lexington has been unable to make significant headway. The exclusion of a higher-quality rival, with the resulting loss of competition, choice, and innovation, is exactly the harm the antitrust laws are designed to prevent. Lexington's interests therefore align with the public policies behind the antitrust laws: the injunction Lexington seeks would open the relevant market to competition on the merits, raise quality and innovation, bring prices down, and deter similar conduct.

149. Fourth, Lexington's injury is the direct product of the market restraint alleged, not a derivative or remote one. Lexington is the immediate target and most direct victim of Medtronic's restraints because it is the rival whose sales those restraints are designed to, and do, foreclose. No intervening party stands between Medtronic's conduct and Lexington's lost sales.

150. Fifth, nothing about Lexington's damages is speculative. Its products are established, clinically superior, and FDA-cleared. Its prices, cost structure, and the universe of hospital customers are known and identifiable. Lexington can calculate the sales lost due to Medtronic's foreclosure with reasonable certainty, including by reference to its materially greater success in more open markets, such as Europe and Australia, where there is less bundling because of public tenders. The but-for world against which Lexington measures its losses is not a market

free of all supply agreements, volume discounts, or commitments. It is a market in which Medtronic does not engage in the exclusionary conduct discussed herein.

151. Sixth, this case presents no risk of duplicative recovery and no need for complex damages apportionment. The losses belong to Lexington and flow directly from the challenged conduct. No indirect purchasers, distribution chain, or other downstream actors compete here for the same pool of damages. Lexington is uniquely positioned to complain of these wrongs and to prove both their occurrence and their anticompetitive effects. Lexington accordingly has antitrust standing to assert these claims.

## CAUSES OF ACTION

### COUNT I: Monopolization (Sherman Act § 2)

152. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

153. The relevant market is the market for laparoscopic universal handle staplers in the United States or, in the alternative, the market for all laparoscopic staplers in the United States.

154. In the relevant market or alternative market, Medtronic holds monopoly power. Medtronic holds a greater than 90% share in the market for laparoscopic universal handle staplers and greater than 53% share even if all laparoscopic staplers are included in the relevant market. In either market, Medtronic's share has been durable, is protected by high barriers to entry and expansion, and is accompanied by direct evidence of monopoly power such as supracompetitive prices, the exclusion of rivals, and the diversion of investment away from stapling innovation. That power is insulated by significant entry barriers and by existing competitors' inability to expand output in the short run.

155. Medtronic has carried out impermissible exclusionary practices whose design or effect is to protect and enhance its monopoly position. Through improper and anticompetitive means, not competition on the merits, Medtronic has thereby willfully acquired, maintained, and enhanced its monopoly power. These exclusionary practices include preventing product trials. They also include bundling that conditions portfolio-wide pricing and rebates on a hospital's purchases of Medtronic Staplers (pricing that fails the discount attribution test). They also include de facto exclusive dealing enforced through market-share commitments, compliance audits, and the forfeiture of rebates, and long-term, staggered contracts with punitive pricing tiers. Individually and together, these practices foreclose competition; no legitimate business purpose justifies them, and any such purpose could be achieved through substantially less restrictive means.

156. Medtronic's position does not rest on merits-based competition, more efficient production, or superior product quality. Medtronic obtained and has maintained its dominant share through anticompetitive means. Demonstrable competitive harm has followed directly in the form of higher prices, reduced output, fewer choices, inferior products, diminished innovation, and limits on rivals' market penetration. The conduct also creates and enhances Medtronic's significant market power.

157. Medtronic's conduct has injured, and continues to threaten, Lexington's business, property, and competitive position, and the injury will continue unless enjoined. Lexington has lost, and will continue to lose, substantial sales and profits that would have occurred but for Medtronic's conduct. These injuries are of the kind the antitrust laws are meant to prohibit and flow directly from Medtronic's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

158. Absent an injunction, Medtronic will keep monopolizing and restraining trade in the relevant market by harming hospitals and shutting out rivals to preserve its monopoly position. This conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT II: Attempted Monopolization (Sherman Act § 2)**

159. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

160. The relevant market is the market for laparoscopic universal handle staplers in the United States or, in the alternative, the market for all laparoscopic staplers in the United States.

161. Medtronic holds a greater than 90% share in the market for laparoscopic universal handle staplers and greater than 53% share even if all laparoscopic staplers are included in the relevant market. That power is insulated by significant entry barriers and by existing competitors' inability to expand output in the short run.

162. If Medtronic does not already hold monopoly power in the relevant market or alternative market, its predatory and anticompetitive conduct creates a dangerous probability that it will acquire that power. Medtronic has acted willfully and with the specific intent to acquire monopoly power. Medtronic's share, Medtronic's doubling down on its exclusionary practices, the significant barriers to entry and expansion, and existing competitors' inability to expand short-run output combine to create a dangerous probability that, unless restrained, Medtronic will achieve monopoly power.

163. Through the alleged exclusionary practices, Medtronic has abused and continues to abuse its market power, severely impeding competition and thereby entrenching and enlarging its position.

164. Medtronic is not winning its business on the merits. The conduct has produced demonstrable harm to competition (higher prices, reduced output, fewer choices, inferior products, and limits on rivals' market penetration) while injuring and threatening Lexington's business, property, and competitive position. These injuries flow directly from Medtronic's Section 2 violation.

165. Unless enjoined, Medtronic will press on with its attempt to monopolize and restrain trade. Medtronic's conduct is a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT III: Unlawful Restraint of Trade (Sherman Act § 1)**

166. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

167. The relevant market is the market for laparoscopic universal handle staplers in the United States or, in the alternative, the market for all laparoscopic staplers in the United States.

168. Medtronic holds a greater than 90% share in the market for laparoscopic universal handle staplers and greater than 53% share even if all laparoscopic staplers are included in the relevant market. That power is insulated by significant entry barriers and by existing competitors' inability to expand output in the short run.

169. Medtronic wields substantial market power in the relevant market or alternative market, its position sits behind high barriers to entry and expansion, and its prices in that market are supracompetitive.

170. As discussed above, Medtronic has entered into anticompetitive agreements with GPOs, hospitals, and hospital systems (including bundled, market-share, volume-commitment, rebate-conditioned and de facto exclusive agreements) that in practice require hospitals to purchase all or nearly all of their laparoscopic universal handle staplers from Medtronic for long periods.

In deploying these trade restraints, Medtronic has acted with the intent to restrain commerce for its own benefit.

171. Medtronic's agreements and arrangements have unreasonably restrained trade and inflicted demonstrable competitive harm in the relevant market. Medtronic has substantially foreclosed greater than 70% of the relevant market. The restraint affected interstate commerce, because the relevant products are manufactured, distributed, sold, and shipped across state lines, and Medtronic's contracts with GPOs, hospitals, and hospital systems affect purchasing, prices, output, and availability of medical devices throughout the United States.

172. Medtronic's practices have done more to undermine competition in the relevant market than to advance any legitimate, procompetitive purpose, and any such purpose could have been achieved by less restrictive means. The conduct has injured, and continues to threaten, Lexington's business, property, and competitive position, and will keep doing so unless enjoined. These injuries flow directly from Medtronic's violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

173. Absent injunctive relief, the restraint of trade will continue. Such conduct is an unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**COUNT IV: Exclusive Dealing (15 U.S.C. §§ 1, 14)**

174. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

175. The relevant market is the market for laparoscopic universal handle staplers in the United States or, in the alternative, the market for all laparoscopic staplers in the United States.

176. Medtronic holds a greater than 90% share in the market for laparoscopic universal handle staplers and greater than 53% share even if all laparoscopic staplers are included in the

relevant market. That power is insulated by significant entry barriers and by existing competitors' inability to expand output in the short run.

177. As alleged, Medtronic holds substantial market power in the relevant market or alternative market, high entry and expansion barriers shield its position, and its prices are supracompetitive.

178. As alleged above, Medtronic has engaged in exclusive dealing and entered into anticompetitive agreements that, in practice, require hospitals to purchase all or nearly all of their laparoscopic universal handle staplers from Medtronic for long periods of time, including through high commitment thresholds, punitive pricing tiers, bundled penalties, staggered terms, and restrictions on product trials. These agreements substantially lessen competition or tend to create, maintain, and enhance a monopoly.

179. These trade restraints have substantially foreclosed competition across more than 70% of the relevant market. That foreclosure, together with the duration and effective non-terminability of Medtronic's agreements, and their operation in compelling hospitals to forgo rival products, excludes existing rivals such as Lexington and prospective entrants alike, entrenches Medtronic's market power, and thereby raises prices and reduces output, innovation, quality, and choice for hospitals and patients. The unreasonableness of the restraint is established by these probable immediate and future effects on competition.

180. Cumulatively, Medtronic's practices have undermined competition more than they have furthered any legitimate, procompetitive purpose, and less restrictive means could have achieved any such purpose. This conduct has injured, and continues to threaten, Lexington's business, property, and competitive position; the injury will persist unless enjoined and flows directly from Medtronic's violations. Medtronic's exclusive dealing has caused, and will continue

to cause, probable immediate and future anticompetitive effects in the relevant market, including supracompetitive prices, reduced output, suppressed innovation, and diminished quality and choice, none of which is outweighed by any legitimate procompetitive justification.

181. In so acting, Medtronic has engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

**COUNT V: Violation of the Massachusetts Antitrust Act,**

**Mass. Gen. Laws ch. 93, §§ 4 and 5**

182. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

183. The relevant market is the market for laparoscopic universal handle staplers in the United States or, in the alternative, the market for all laparoscopic staplers in the United States.

184. Medtronic holds a greater than 90% share in the market for laparoscopic universal handle staplers and greater than 53% share even if all laparoscopic staplers are included in the relevant market. That power is insulated by significant entry barriers and by existing competitors' inability to expand output in the short run.

185. The Massachusetts Antitrust Act is intended to encourage free and open competition and is construed in harmony with comparable federal antitrust statutes insofar as practicable. Medtronic's contracts, combinations, and conduct restrain trade or commerce in Massachusetts and monopolize or attempt to monopolize trade or commerce in Massachusetts. Medtronic's conduct directed at Massachusetts hospitals occurs in Massachusetts. For example, as alleged above, a Boston academic medical center declined to proceed with an evaluation of the AEON Staplers because of its bundled agreement with Medtronic. Lexington, a company based in Massachusetts, also suffers its injury here.

186. Because Medtronic's contracts, combinations, and agreements unreasonably restrain trade or commerce in Massachusetts, its conduct violates Mass. Gen. Laws ch. 93, § 4. And because Medtronic has monopolized or attempted to monopolize a part of trade or commerce in Massachusetts, its conduct violates Mass. Gen. Laws ch. 93, § 5.

187. By reason of Medtronic's violations of the Massachusetts Antitrust Act, Lexington has suffered injury to its business or property, entitling it to damages, treble damages, attorneys' fees, costs, and injunctive relief under Mass. Gen. Laws ch. 93, § 12 and related provisions.

## COUNT VI: Intentional Interference With Advantageous Business Relations

188. Lexington repeats and realleges each of the foregoing paragraphs, and incorporates them by reference, as if fully set forth herein.

189. Lexington held reasonable expectations of economic advantage from its sales of the AEON Staplers to hospitals and hospital systems. Those expectations arose not from a merely potential or hypothetical market but from specific, identifiable, and probable business relationships: hospitals and hospital systems that had requested, initiated, or conducted evaluations or trials of the AEON Staplers; that were in active discussions or negotiations with Lexington to purchase or convert; or that were already purchasing and positioned to expand their use, together with the surgeons at those institutions who preferred to adopt the AEON Staplers. Each relationship carried a concrete and not unrealistically remote expectancy of financial benefit.

190. Medtronic knew of Lexington's prospective relationships and intentionally interfered with them through improper means, including anticompetitive bundling, de facto exclusive dealing, punitive pricing threats, and conduct designed to block product trials and prevent hospitals from considering Lexington's products.

191. Among many others, Medtronic has interfered with at least the following prospective customers of Lexington: Ascension, BayCare (St. Joseph's Hospital, Mease Countryside Hospital, and Morton Plant North Bay Hospital), BJC Health System, Brigham and Women's Hospital, Community Memorial, Dell Seton Medical Center, Duke, Hackensack, Moffitt Cancer Center, Nebraska Medicine, Saint Louis University Hospital, St. Bernardine Medical Center, Stanford, UCLA, UPMC, and Wellstar.

192. Medtronic's own conduct establishes its knowledge of these specific relationships: it monitored competitive accounts and took aim at the very hospitals and hospital systems it knew to be evaluating, trialing, negotiating for, or beginning to purchase rival products. It aimed its exclusionary bundling, exclusive-dealing, punitive-pricing, and trial-blocking conduct at those identifiable customers to disrupt prospective relationships. The means were improper. As alleged above, they were unlawful under federal and Massachusetts antitrust law and went beyond any legitimate competitive conduct.

193. Medtronic intentionally and wrongfully interfered with Lexington's expected economic advantage, without justification, by (among other things) carrying out the anticompetitive conduct described above, targeting the specific hospitals where Lexington was making inroads, and coercing hospitals to break off their evaluations of and negotiations with Lexington. The direct result was that hospitals were dissuaded from purchasing the AEON Staplers, and Lexington's expected economic advantage was destroyed.

194. Absent Medtronic's interference, a reasonable probability existed that Lexington would have realized the economic benefits of its AEON products. No adequate justification supported the interference. And because Medtronic acted with malice and/or reckless indifference to the rights of others, its conduct offends the public interest.

195. Lexington has suffered, and will keep suffering, damages from Medtronic's interference, including lost profits. The interference will persist unless this Court restrains it. Lexington is entitled to damages and injunctive relief under this cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lexington Medical, Inc. respectfully asks that the Court enter judgment for Lexington and against Medtronic, and that it award the following relief:

(a) Declaring and adjudging that Medtronic has violated Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the Massachusetts Antitrust Act, and Massachusetts common law;

(b) Entering an award of damages for Lexington in an amount to be proven at trial, trebled as the law provides;

(c) Awarding prejudgment and post-judgment interest to Lexington;

(d) Permanently enjoining Medtronic from engaging in exclusionary conduct, including enforcing or entering into exclusionary and predatory agreements;

(e) Ordering Medtronic to allow hospitals and hospital systems to carry out product evaluations and trials of rival products;

(f) Ordering Medtronic to give appropriate notice to affected GPOs, hospitals, and hospital systems, including that evaluating and purchasing Lexington products will not cost them pricing on unrelated products;

(g) Awarding Lexington its reasonable attorneys' fees and its costs of suit, including under 15 U.S.C. § 15, 15 U.S.C. § 26, and Mass. Gen. Laws ch. 93, § 12; and

(h) Granting all other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b), Plaintiff Lexington Medical, Inc. demands a jury trial of all issues so triable.

Dated: November 5, 2026

LEXINGTON MEDICAL, INC.,

By its attorneys,

/s/ Ryan M. Cunningham_______________

Peter E. Ball, BBO #546031
Ryan M. Cunningham, BBO #661440
FITCH LAW PARTNERS LLP
84 State Street, 11th Floor
Boston, MA 02109
Tel - (617) 542-5542
Fax – (617) 542-1542
peb@fitchlp.com
rmc@fitchlp.com

Stephen W. Larson (*pro hac vice pending*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Tel – (949) 760-0404
stephen.larson@knobbe.com

Adam B. Powell (*pro hac vice pending*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
Tel – (858) 707-4000
adam.powell@knobbe.com